# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE APPRAISAL OF DOLE FOOD COMPANY, INC. | ) ) | CONSOLIDATED C.A. No. 9079-VCL |

## OPINION

Date Submitted: October 14, 2014
Date Decided: December 9, 2014

Stuart M. Grant, Geoffrey C. Jarvis, Kimberly A. Evans, GRANT & EISENHOFER, P.A., Wilmington, Delaware; *Attorneys for Petitioners Hudson Bay Master Fund Ltd., Hudson Bay Merger Arbitrage Opportunities Master Fund Ltd., and Ripe Holdings LLC.*

Bruce Silverstein, Elena C. Norman, James M. Yoch, Jr., Nicholas J. Rohrer, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; *Attorneys for Respondent Dole Food Company, Inc.*

**LASTER, Vice Chancellor.**

Petitioners Hudson Bay Master Fund Ltd. and Hudson Bay Merger Arbitrage Opportunities Master Fund Ltd. (together, "Hudson Bay") and Ripe Holdings LLC ("Ripe") have pursued their statutory right to an appraisal of their shares of common stock of Dole Food Company, Inc. ("Dole"). In discovery, Dole sought information regarding valuations of Dole common stock that the petitioners prepared, reviewed, or otherwise considered when deciding whether to purchase or sell Dole common stock or seek appraisal. The petitioners objected to producing the information. Dole then noticed Rule 30(b)(6) depositions of the petitioners and identified the valuations as a topic of questioning. During the depositions, petitioners' counsel instructed the Rule 30(b)(6) witnesses not to testify about the valuations, citing a lack of relevance.

Dole has moved to compel production of the valuation-related materials and for supplemental depositions of the Rule 30(b)(6) witnesses. The motion is granted.

## I.    FACTUAL BACKGROUND

On June 11, 2013, Dole announced that its board of directors had received an unsolicited proposal from David H. Murdock, Dole's CEO, Chairman, and controlling stockholder, to acquire all of the shares of Dole common stock that he did not already own for $12.00 per share in cash. On August 12, Dole and Murdock announced their agreement on a take-private merger at $13.50 per share in cash (the "Merger").

On October 31, 2013, Dole held a special meeting of stockholders to consider the Merger. The record date for the Merger was September 27. Dole's stockholders approved the Merger, which closed on November 1.

1

After the Merger closed, Hudson Bay filed a petition seeking appraisal for more than 3.6 million shares of Dole common stock. Hudson Bay purchased all of the shares after Murdock announced his take-private proposal on June 11, 2013. Hudson Bay purchased 1.1 million of its shares after the record date for the special meeting. Also during June and July, Hudson Bay sold at least 156,280 shares of Dole common stock for prices ranging from $12.69 to $12.90 per share. During the days before the Merger closed, Hudson Bay purchased nearly 4.6 million shares of Dole common stock for which it received the Merger consideration.

Ripe filed a petition seeking appraisal for approximately 2.8 million shares of Dole common stock. Ripe is a special-purpose investment vehicle jointly owned by different funds managed by affiliates of Fortress Investment Group ("Fortress"). Ripe purchased all of its shares after Murdock announced his take-private proposal. It acquired 250,000 of the shares after the record date for the special meeting.

During discovery, Dole served document requests and interrogatories seeking information about any valuations or similar analyses of Dole that Hudson Bay or Ripe prepared, reviewed, or considered when buying or selling Dole stock or when seeking appraisal. Dole only sought pre-litigation materials. The petitioners objected to the document requests on the grounds that the information was irrelevant and that it was premature to provide discovery on valuation before the expert discovery phase. The petitioners objected to the interrogatories as "seek[ing] an opinion on areas where an expert will be opining, not the Petitioners." Dole sent the petitioners a deficiency letter that cited authority supporting production of the information. The petitioners responded

by letter in which they maintained their objections. Counsel met and conferred by telephone and email, but they were unable to resolve their disagreements.

Dole then served notices of deposition for each of the petitioners pursuant to Court of Chancery Rule 30(b)(6). The noticed topics included any valuations of Dole performed, reviewed, or considered by the petitioners when purchasing Dole stock or seeking appraisal. The petitioners objected to the deposition notices, contending that the valuation information was neither relevant nor reasonably calculated to lead to the discovery of admissible evidence and that it was protected by the attorney-client privilege. Dole sent a deficiency letter insisting on the production of witnesses to testify about valuation. The petitioners maintained their objection.

Hudson Bay designated Henry Choi, a portfolio manager, as its Rule 30(b)(6) witness. Hudson Bay maintained its objection to producing a witness on (i) Hudson Bay's reasons for purchasing or selling Dole shares, (ii) its business models, and (iii) its pre-litigation internal valuations of Dole. At the outset of the deposition, Choi stated that he was not prepared to testify about the topics to which Hudson Bay objected. During the deposition, Hudson Bay's counsel consistently objected to questions about valuation and instructed Choi not to answer on the basis of relevance. Choi followed his counsel's instructions. Dole learned from the deposition that, before the Merger, Hudson Bay created an Excel file that valued Dole that using three standard methodologies: (i) discounted cash flows ("DCF"), (ii) comparable companies, and (iii) sum of the parts.

Ripe designated John Neumark as its Rule 30(b)(6) witness and made the same objections as Hudson Bay to topics in the deposition notice. Neumark is a managing

3

director at FIG, LLC, the subsidiary that serves as the investment manager for all of the Fortress funds. Like Choi, Neumark stated at the outset of the deposition that he was not prepared to testify about the topics to which Ripe objected. During the deposition, Ripe's counsel objected to questions relating to valuation and instructed Neumark not to answer on the basis of relevance. Neumark followed his counsel's instructions. Dole learned from the deposition that, before the Merger, Neumark prepared a seven to ten page memorandum that was presented to Fortress' investment management committee with his recommendation about the investment strategy for Dole common stock (the "Fortress Memorandum"). Neumark testified that the Fortress Memorandum set out a valuation of Dole based on a DCF analysis and included a downside case that valued Dole at less than the Merger consideration.

Dole moved to compel production of information regarding valuations or analyses of Dole's value that the petitioners prepared, reviewed, or considered in connection with their decision to purchase Dole stock or seek appraisal. Dole also sought supplemental Rule 30(b)(6) depositions to address the topics that were not covered during the original depositions.

## II. LEGAL ANALYSIS

Rule 26(b)(1) frames the scope of permissible discovery:

> Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any documents, electronically stored information, or tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection

that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

Ct. Ch. R. 26(b)(1). Under this rule, the essential characteristic of discoverable information is relevance, "for it is only relevant matter that may be the subject of discovery." 8 Charles A. Wright, Arthur R. Miller & Richard L. Marcus, FEDERAL PRACTICE AND PROCEDURE § 2008 (3d ed. 2007).

The last sentence of Rule 26(b)(1) anticipates a potential objection that a responding party might raise to producing otherwise relevant material, namely that the material would not be admissible at trial. Rule 26(b)(1) rejects the potential objection, stating: "It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence."

The federal version of Rule 26(b)(1), on which this court's Rule 26(b)(1) was based, originally did not include a sentence on admissibility. In 1948, the United States Supreme Court added the following sentence to the federal rule: "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." The amendment responded to a few "early cases [that] misread the word 'relevant' in Rule 26(b) as meaning 'competent' under the rules of evidence." WRIGHT, MILLER & MARCUS, *supra*, § 2008. The additional sentence clarified that "it is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." *Id*. When Delaware adopted its new rules of

procedure in 1948, they were modeled on the federal rules, and the Delaware version of Rule 26(b)(1) from the outset included the current language on admissibility. *See* Daniel L. Herrmann, *The New Rules of Procedure in Delaware*, 18 F.R.D. 327, 327 (1956) ("In 1948, the Courts of Delaware shook off the shackles of mediaeval scholasticism and adopted Rules governing civil procedure modeled upon the Federal Rules of Civil Procedure." (internal quotation marks omitted)).

Under Rule 26(b)(1), therefore, relevance is the touchstone for discoverability, and lack of admissibility is not an objection so long as the discovery is "reasonably calculated to lead to the discovery of admissible evidence." To be discoverable, the material must be both relevant and, at a minimum, "reasonably calculated to lead to the discovery of admissible evidence." As a shorthand, this decision refers to the latter aspect of Rule 26(b)(1) as potential admissibility.

## A.    Relevance

In their discovery responses and during the Rule 30(b)(6) depositions, the petitioners objected to discovery into their valuations on grounds of relevance. In response to the motion to compel, they withdrew that implausible objection.

Information sought in discovery is considered relevant "if there is any possibility that the information sought may be relevant to the subject matter of the action." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Stauffer Chem. Co.*, 1990 WL 177572, at *3 (Del. Super. Nov. 9, 1990) (citation omitted).

> [T]he requirement of relevancy must be construed liberally . . . . [T]he spirit of Rule 26(b) calls for all relevant information, however remote, to be brought out for inspection not only by the opposing party but also for the

> benefit of the Court . . . . Thus, discovery should ordinarily be allowed under the concept of relevancy unless it is clear that the information sought can have no possible bearing upon the subject matter of the action.

*Boxer v. Husky Oil Co.*, 1981 WL 15479, at *2 (Del. Ch. Nov. 9, 1981) (citation omitted).

An appraisal is a "legislative remedy which is intended to provide shareholders, who dissent from a merger asserting the inadequacy of the offering price, with an independent judicial determination of the fair value of their shares." *Ala. By-Products Corp. v. Neal*, 588 A.2d 255, 256 (Del. 1991). The central "issue is the determination of the value of the appraisal petitioners' shares on the date of the merger[.]" *Cede & Co. v. Technicolor, Inc.*, 542 A.2d 1182, 1187 (Del. 1988). Even in a statutory appraisal proceeding, "the rules of discovery should [] be construed liberally." *Bershad v. Curtiss-Wright Corp.*, 1983 WL 10916, at *7 (Del. Ch. Mar. 21, 1983); *see MacLane Gas Co. Ltd. P'ship v. Enserch*, 1990 WL 96247, at *3 (Del. Ch. July 5, 1990); *Kaye v. Pantone, Inc.*, 1981 WL 15072, at *1 (Del. Ch. Oct. 6, 1981).

Several Court of Chancery decisions have ordered production of pre-suit valuation material prepared by appraisal petitioners.[1] These decisions recognize that the pre-

---

[1] *See In re Appraisal of NetSpend Hldgs., Inc.*, 2014 WL 2536825, at *1 (Del. Ch. June 3, 2014) (ordering production of documents relating to petitioners' pre-suit valuations of respondent); *Highfields Capital, Ltd. v. AXA Fin., Inc.*, C.A. No. 804-N (Del. Ch. July 18, 2006) (ORDER) (same); *Greenlight Capital Qualified, L.P. v. Emerging Commc'ns, Inc.* (*Greenlight II*), 2001 WL 220861, at *2 (Del. Ch. Feb. 23, 2001) (ordering petitioner to permit testimony by Rule 30(b)(6) witness on valuation matters in coordinated appraisal proceeding and breach of fiduciary duty action); *Greenlight Capital Qualified, L.P. v. Emerging Commc'ns, Inc.* (*Greenlight I*), 2000 WL 33521110, at *1 (Del. Ch. Aug. 21, 2000) (ordering petitioner to produce Rule 30(b)(6)

7

litigation valuations are relevant to the central issue in the proceeding, which is the value of the subject company. They also are relevant to issues of such as the appropriate inputs and considerations for valuation methodologies. *See Kaye*, 1981 WL 15072, at \*1. They also may bear on witness credibility, for example if a petitioner or its expert advances positions in litigation that differ materially from the petitioner's pre-litigation views. This information could therefore potentially be used "for purposes of cross-examination or rebuttal of [] expert testimony." *NetSpend*, 2014 WL 2536825, at \*1.

These precedents are persuasive. The petitioners' objection to producing the valuation-related materials on the basis of relevance was not well-founded. Dole should not have been forced to file a motion to compel to induce the petitioners to abandon it.

## B.   Potential Admissibility

Rather than continuing to fight a losing battle on relevance, the petitioners oppose the motion to compel on the basis of potential admissibility, namely that that an inquiry into their pre-litigation valuations is not be reasonably calculated to lead to the discovery of admissible evidence. The petitioners argue that their valuations are opinions, not facts, and that the question of valuation in an appraisal is purely a matter for the experts. As petitioners see it, their witnesses are not experts, and their valuations do not satisfy the narrow exceptions that the rules of evidence make for lay opinions. Therefore, they say, there is no basis upon which any information about their opinions could be admissible at

---

witness on valuation matters in coordinated appraisal proceeding and breach of fiduciary duty action).

trial. According to the petitioners, the decisions in which this court ordered production of similar valuation-related materials either did not consider potential admissibility (*Highfields Capital* and *Greenlight Capital*) or erred in concluding that the information could lead to the discovery of admissible evidence (*NetSpend*).

In my view, the valuation-related information that Dole seeks easily satisfies the potential admissibility requirement. A statutory appraisal proceeding is not a fault-based case in which one side has the burden of proof and loses if it fails to meet its burden. "In a statutory appraisal proceeding, both sides have the burden of proving their respective valuation positions by a preponderance of evidence." *M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513, 520 (Del. 1992). "No presumption, favorable or unfavorable, attaches to either side's valuation, including the actual merger price." *Pinson v. Campbell-Taggart, Inc.* 1989 WL 17438, at *6 (Del. Ch. Feb. 28, 1989); *accord Gilbert v. M.P.M. Enters., Inc.*, 709 A.2d 663, 667 (Del. Ch. 1997) ("[N]either party is entitled to any preference or presumption in [an appraisal] proceeding.").

> Each party also bears the burden of proving the constituent elements of its valuation position by a preponderance of the evidence, including the propriety of a particular method, modification, discount, or premium. If both parties fail to meet the preponderance standard on the ultimate question of fair value, the Court is required under the statute to make its own determination.

Jesse A. Finkelstein & John D. Hendershot, *Appraisal Rights in Mergers and Consolidations*, 38–5th C.P.S. §§ IV(H)(3), at A–89 to A–90 (BNA) (collecting cases).

If the parties to an appraisal do not retain experts, or if their experts prove not to be credible, then, by statute, this court is obligated to determine the fair value of the

subject corporation's shares. 8 *Del. C.* § 262(h) ("the Court shall determine the fair value of the shares"). In making its determination, this court can consider a wide range of factual evidence, including, but not limited to, the market price, the merger price, other offers for the company or its assets, prices at which knowledgeable insiders sold their shares, internal corporate documents from the respondent, and valuation work prepared for non-litigation purposes. Even when parties have retained valuation experts and the court has relied on their opinions when determining fair value, the court has considered factual evidence relating to valuation as a cross-check, or reality-check, on the litigation-driven figures generated by the experts. The fact that a party has retained an expert does not enable the party to shield factual material relating to valuation that otherwise would be discoverable and admissible.

### 1. The Discovery-Stage Burden As To Potential Admissibility

As noted, several Delaware decisions have ordered the production of the type of valuation-related materials that the petitioners here wish to shield from discovery. In *NetSpend*, Vice Chancellor Glasscock rejected the same argument against potential admissibility that the petitioners now advance, stating "I cannot say with confidence . . . that the possibility of [admissible] evidence coming to light is entirely foreclosed." 2014 WL 2536825, at *1. The petitioners argue that he erred by placing the burden on the party resisting discovery to prove a negative by foreclosing admissibility, rather than placing the burden on the party seeking discovery to establish that the discovery was reasonably likely to lead to the discovery of admissible evidence.

10

The burden that a party must meet to obtain discovery under Rule 26(b)(1) is slight, but it does rest on the party seeking the discovery.[2] Admittedly, there are some Delaware decisions which, like *NetSpend*, could be read to have placed the burden on the objecting party to show that the information sought was not reasonably calculated to lead to admissible evidence. Like *NetSpend*, each decision has done so indirectly and implicitly by expressing doubt about whether the inquiry would be productive.[3]

I do not share the petitioners' view that this elocution evidences a misunderstanding about the proper allocation of the Rule 26(b)(1) burden. Rather, the language reflects a proper understanding of the minimal nature of the burden and a practical form of burden-shifting similar to the approach used by the federal courts. *See generally* WRIGHT, MILLER & MARCUS, *supra*, § 2008. Under this approach, the party seeking the information must first provide some minimal explanation as to why the discovery satisfies the requirements of relevance and conditional admissibility.[4] It is then

---

[2] *See, e.g., Minieri v. Bennett*, 2012 WL 5951514, at *2 (Del. Ch. Nov. 29, 2012); *Grace Bros. v. Siena Hldgs., Inc.*, 2008 WL 441390, at *1 (Del. Ch. Feb. 14, 2008); *Cede & Co v. Technicolor, Inc.*, 10 Del. J. Corp. L. 158, 162 (Del. Ch. 1984); *Hopkins v. Chesapeake Util. Corp.*, 300 A.2d 12, 14 (Del. Super. 1972).

[3] *See, e.g., Atkins v. Hiram*, 1993 WL 545416, at *3 (Del. Ch. Dec. 23, 1993) ("It is not clear that the evidence sought is not reasonably calculated to lead to the discovery of admissible evidence in this action."); *Weinberger v. UOP, Inc*, 5 Del. J. Corp. L. 158, 165 (Del. Ch. 1979) ("On the record presented for argument on this motion, I cannot say that the responses sought . . . are not reasonably calculated to lead to the discovery of admissible evidence.").

[4] *See Auguste v. Alderden*, 2008 WL 3211283, at *3 (D. Colo. Aug. 6, 2008) ("When relevance is not apparent on the face of a party's discovery request, the party seeking the discovery has the burden to show the relevance by sufficiently demonstrating

11

up to the party opposing discovery to show that the explanation is erroneous and that the Rule 26(b)(1) standard has not been met.[5] Delaware decisions addressing relevance suggest a similar approach.[6]

---

that the request appears reasonably calculated to lead to the discovery of admissible evidence."); *E.E.O.C. v. Renaissance III Org.*, 2006 WL 832504, at *1 (N.D. Tex. Mar. 30, 2006) ("As the party seeking discovery, defendant must establish this threshold burden [of showing that the discovery appears reasonably calculated to lead to the discovery of admissible evidence]"); *Vardon Golf Co. v. BBMG Golf Ltd.*, 156 F.R.D. 641, 650 (N.D. Ill. 1994) ("[The party seeking discovery] need only articulate why it is reasonable to believe that information of that nature would be revealed were discovery permitted."); *Fid. Fed. Sav. & Loan Ass'n v. Felicetti*, 148 F.R.D. 532, 534 (E.D. Pa. 1993) ("plac[ing] the onus on the plaintiffs to show that the documents . . . are relevant and likely to lead to the discovery of admissible evidence.").

[5] *See Bennett v. La Pere*, 112 F.R.D. 136, 139 (D.R.I. 1986) ("Once it is determined that material sought by discovery is relevant and not privileged, the discoverer has crossed the modest threshold which Rule 26(b) erects. From that point forward, the party opposing discovery should have the burden of establishing some good cause or sound reason for blocking disclosure."); *accord Rolscreen Co. v. Pella Products of St. Louis, Inc.*, 145 F.R.D. 92, 95 (S.D. Iowa 1992) (following *Bennett*). The *Bennett* line of cases rejects a competing approach under which the party seeking discovery must make "some particularized showing of a likelihood that admissible evidence will be generated . . . ." *Bottaro v. Hatton Assocs.*, 96 F.R.D. 158, 160 (E.D.N.Y. 1982). The *Bennett* decision explained why the "particularized showing" requirement is inconsistent with the liberal approach to discovery contemplated by the federal rules. *See Bennett*, 112 F.R.D. at 139-40. In my view, requiring a "particularized showing" is equally inconsistent with this court's rules and with precedent taking a liberal approach to discovery.

[6] *See Boxer*, 1981 WL 15479, at *2 (explaining that information is discoverable "unless it is clear that the information sought can have no possible bearing upon the subject matter of the action."); *see also Stauffer Chem.*, 1990 WL 177572, at *3 (explaining that information is discoverable "if there is any possibility that the information sought may be relevant to the subject matter of the action"); *Blaustein v. Standard Oil Co.*, 70 A.2d 716, 727 (Del. 1949) ("Broadly speaking, the objection of irrelevancy and immateriality should only be sustained where it appears beyond reasonable doubt that the information sought could not be relevant or material and would not be reasonably calculated to lead to the discovery of admissible evidence."); *Klerlein*

12

As I read it, *NetSpend* did not misallocate the burden of showing potential admissibility. The decision therefore provides persuasive authority for the proposition that pre-litigation valuation materials prepared by appraisal petitioners are generally discoverable because the information is reasonably calculated to lead to the discovery of admissible evidence.

## 2. The Potential Admissibility Of Lay Opinion On Valuation

With the burden conscientiously allocated to the defendants, the petitioners' valuations continue to meet the requirement of potential admissibility. As noted, the petitioners argue otherwise, contending that their valuations are opinions, that the question of valuation in an appraisal is purely a matter for experts, and that their Rule 30(b)(6) designees were lay witnesses whose opinion testimony is inadmissible unless it

---

*v. Local Union No. 451*, 1979 WL 174451, at *5 (Del. Ch. Sept. 11, 1979) ("The objections of relevancy should only be sustained where it appears beyond a reasonable doubt that the information sought could not be relevant or material and would not be reasonably calculated to lead to discovery of admissible evidence."); *New Castle Cnty. v. Christiana Town Ctr., LLC*, 2004 WL 1835103, at *1 (Del. Ch. Aug. 16, 2004) (quoting *Boxer*); *Loretto Literary & Benev. Inst. v. Blue Diamond Coal Co.*, 1980 WL 268060, at *4 (Del. Ch. Oct. 24, 1980) ("While discovery must, therefore, be relevant to the subject matter of the suit, relevancy must be viewed liberally and if there is any possibility that the discovery will lead to relevant evidence it should be permitted." (citations omitted)); *Weinberger v. United Fin. Corp*, 1979 WL 2707 (Del. Ch. Nov. 20, 1979) (allowing discovery where the court was "not prepared to state as a blanket proposition that inquiry . . . can never lead to the discovery of relevant evidence bearing on the question [at issue]"). A number of cases state the related proposition that discovery should be allowed unless to do so would impede the administration of justice. *See, e.g.*, *Mann v. Oppenheimer & Co.*, 517 A.2d 1056, 1061 (Del. 1986); *Fish Eng'g Corp. v. Hutchinson*, 162 A.2d 722, 725 (Del. 1960); *East v. Tansey*, 1993 WL 330063, at *1 (Del. Ch. Aug. 24, 1993).

falls within an exception for lay opinion testimony under Delaware Rule if Evidence 701.

That rule permits consideration of

> opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue and (c) not based on scientific, technical or other specialized knowledge within the scope of Rule 702 [relating to expert testimony].

D.R.E. 701.

Assuming Rule 701 applies, I do not believe that the subject of valuation can be cabined easily as a matter requiring "scientific, technical or other specialized knowledge within the scope of Rule 702." Nor, in this case, are the petitioners' witnesses unqualified to express views on value. In my view, their testimony and their pre-litigation valuations will be "helpful to . . . the determination of a fact in issue," namely the determination of the fair value of Dole.

### a. Rule 703 As An Alternative Basis For Admissibility

As a threshold matter, it is not clear at this stage that the only way that the petitioners' valuation materials might be considered at trial is as lay opinion under Rule 701. Alternatively, Rule 703 provides that

> [a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

14

D.R.E. 703. Facts or data that "would otherwise be inadmissible" thus can be admitted as part of an expert's report if an expert in that field "would reasonably rely on those kinds of facts or data in forming an opinion on the subject."

Experts on valuation in this court often consider other valuation work when rendering their opinions. For example, when developing a weighted average cost of capital for the subject company, an expert may prepare her own calculation and then demonstrate the reasonableness of the selected inputs by showing that other valuations have used the identical or similar inputs, or that the inputs that the expert selected were more conservative than the inputs used by others. The expert may employ similar reasoning to attack the opposing expert's work by showing that other valuations have not used comparable inputs or that the approach selected by the other side's expert was particularly aggressive. Comparisons are made frequently to reports from securities analysts, presentations by the investment bankers who worked on the deal, or internal materials prepared by corporate personnel.

In my view, even assuming that the petitioners were correct and that their valuation work was otherwise inadmissible, it could be reviewed and considered by the respondent's expert. The respondent's expert could discuss the valuation work in her report, either to reinforce the reasonableness of her own approach or to criticize her opponent's work. Under Rule 703, the report of the respondent's expert would be admissible, including the portions discussing the petitioners' valuation work, regardless of whether the petitioners' valuation work was not independently admissible.

### b.      The Valuation Exercise As Specialized Knowledge

Addressing the petitioners' Rule 701 theory more directly, their anti-admissibility argument rests on the premise that valuation is a matter requiring "scientific, technical or other specialized knowledge," making it exclusively a matter for experts under Rule 702. Although valuation is certainly a subject where expert testimony is appropriate and helpful, the field is not an esoteric specialty. Rather than resembling rare disciplines like nuclear physics, brain surgery, or accident reconstruction, valuation more closely resembles the common skill of driving a car. There are professional drivers and quotidian commuters, and while the abilities and knowledge of the former dwarf those of the latter, even a quotidian commuter can offer insight into how a fellow driver handles himself on the road. A witness need not be "qualified as an expert in accident reconstruction" in order to testify, for example, that "based on the damage to the right side of [a vehicle], that [it] was moving to the left at the time of impact," *McKinley v. Casson*, 80 A.3d 618, 627 (Del. 2013), or that the driver in front of the witness "did have time to complete her turn" safely, *Norton v. Mulligan*, 2001 WL 1738871, at *4 (Del. Super. June 29, 2001) *aff'd*, 788 A.2d 131 (Del. 2001). Factual observations of this type, even if expressed as opinion, differ from lay attempts at after-the-fact accident reconstruction, which is a matter reserved for experts. *See Alexander v. Cahill*, 829 A.2d 117, 121 (Del. 2009).

Like driving, the valuation field does not lend itself to metes-and-bounds demarcations of expert-only territory.[7] Some degree of knowledge about valuation has become a practical necessity for contemporary citizens of the American Republic. As Chief Justice Strine has explained, "most ordinary Americans have little choice but to invest in the market. They are in essence 'forced capitalists,' even though they continue to depend for their economic security on their ability to sell their labor and to have access to quality jobs." Leo E. Strine, Jr., *Toward Common Sense and Common Ground? Reflections on the Shared Interests of Managers and Labor in A More Rational System of Corporate Governance*, 33 J. Corp. L. 1, 4 (2007).

> Individuals have become increasingly active in financial markets, and market participation has been accompanied or even promoted by the advent of new financial products and services . . . . At the same time, market liberalization and structural reforms in Social Security and pensions have caused an ongoing shift in decision power away from the government and employers toward private individuals. Thus, individuals have to assume more responsibility for their own financial well-being.

---

[7] Indeed, both Delaware decisions and those knowledgeable about valuation recognize that the field is as much art as science. *See, e.g.*, *Matter of Shell Oil Co.*, 607 A.2d 1213, 1221 (Del. 1992) ("Valuation is an art rather than a science."); *In re Smurfit-Stone Container Corp. S'holder Litig.*, 2011 WL 2028076, at *24 (Del. Ch. May 20, 2011) ("[U]ltimately, valuation is an art and not a science."); Peter E. Bronstein & David A. Typermass, *Business Valuation Reports—The Importance of Proactive Lawyering*, N.Y. St. B.J., February 2010, at 12, 16 ("[T]he appraisal process is not an exact science . . . . Business valuation is often described as part art and part science because many of the techniques used by business appraisers require the use of subjective assumptions."); Kenton K. Yee, *Control Premiums, Minority Discounts, and Optimal Judicial Valuation*, 48 J.L. & Econ. 517, 536 (2005) ("The practice of valuation is an inexact art, not a precise science."); Barry M. Wertheimer, *The Shareholders' Appraisal Remedy and How Courts Determine Fair Value*, 47 Duke L.J. 613, 629 (1998) ("Each appraisal technique is but a way of estimating the fair value or true value or intrinsic value of a company, and undeniably, valuation is an art rather than a science." (internal quotation marks omitted)).

Maarten van Rooij, Annamaria Lusardi & Rob Alessie, *Financial Literacy And Stock Market Participation*, 101 Journal of Financial Economics 449, 449 (2011). "The investor class is now widespread and will only grow larger as the 401(k) money machine continues to churn." Leo E. Strine, Jr., *Breaking the Corporate Governance Logjam in Washington: Some Constructive Thoughts on A Responsible Path Forward*, 63 Bus. Law. 1079, 1082 (2008).

Implicit in the decision to buy, hold, or sell a stock is an assessment of the stock's value. "Our law should . . . hesitate to ascribe rube-like qualities to stockholders." *Chesapeake Corp. v. Shore*, 771 A.2d 293, 328 (Del. Ch. 2000) (Strine, V.C.). If stockholders are presumed competent to own stock in the first place, and effectively required to do so by the federal government's policies on saving for college and retirement, then they should be presumed competent to buy, sell, or seek appraisal. If they have done these things, then they should be competent to explain why, as a factual matter, the made the decisions they did, including the views they held contemporaneously about the value of the subject company. *Cf. id.* ("If stockholders are presumed competent to buy stock in the first place, why are they not presumed competent to decide when to sell in a tender offer after an adequate time for deliberation has been afforded them?").

For stockholders to be competent to express views on valuation, and for the court to be able to consider them, seems particularly appropriate given that the ultimate product of an appraisal proceeding is an opinion by a non-expert. As noted, the court is obligated to determine the fair value of the subject corporation's shares. 8 *Del. C.* § 262(h);

Finkelstein & Hendershot, *supra*, at A–89 to A–90 (BNA) ("If both parties fail to meet the preponderance standard on the ultimate question of fair value, the Court is required under the statute to make its own determination."). But as this court's opinions frequently have observed, the past and current members of this court are "law-trained judges," not valuation experts.[8] Ironically for the petitioners' position that valuation is exclusively a matter for experts, the appraisal statute mandates that a lay individual express the final conclusion on the fair value of the petitioners' shares.

---

[8] *See, e.g., Laidler v. Hesco Bastion Envtl., Inc.*, 2014 WL 1877536, at *1 (Del. Ch. May 12, 2014) ("This case presents a demand for a statutory appraisal, a response to which should be a daunting task for a law-trained judge . . . ." (footnote omitted)); *Huff Fund Inv. P'ship v. CKx, Inc.,* 2013 WL 5878807, at *1 (Del. Ch. Nov. 1, 2013) ("A law-trained judge would have scant grounds to substitute his own appraisal for those of the real-estate valuation experts, and would have no reason to second-guess the market price absent demonstration of self-dealing or a flawed sales process. I am faced with a similar situation in this much more complex venue of the sale of a corporate enterprise."); *In re Orchard Enters., Inc.*, 2012 WL 2923305, at *18 (Del. Ch. July 18, 2012) (Strine, C.) ("As a law-trained judge who has to come up with a valuation deploying the learning of the field of corporate finance, I choose to deploy one accepted method as well as I am able, given the record before me and my own abilities."); *Global GT LP v. Golden Telecom, Inc.*, 993 A.2d 497, 517 n.126 (Del. Ch. 2010) *aff'd*, 11 A.3d 214 (Del. 2010) (explaining that "academics and professionals throw around . . . ranges of value [that] are used by a law-trained judge to come to a single point estimate of value" and that "[t]he law-trained judges who must perform such analyses are more conscious than anyone of the inherent risk of error in such an endeavor, and indeed of the reality that no one can really tell if an error was made"); *Finkelstein v. Liberty Digital, Inc.*, 2005 WL 1074364, at *12 (Del. Ch. Apr. 25, 2005) (Strine, V.C.) ("The judges of this court are unremittingly mindful of the fact that a judicially selected determination of fair value is just that, a law-trained judge's estimate that bears little resemblance to a scientific measurement of a physical reality."). Perhaps someday a true valuation expert will join the Chancery bench, or a member of the court will claim that status. To date, none of us have the background, nor been so bold in asserting the expertise.

To hear from the petitioners about their contemporaneous views on valuation, and to permit respondent's counsel to take discovery into those views, does not determine how much weight a court will give to the evidence. It could be that in a given case, a petitioner has not given much thought to valuation, or had no meaningful basis for deciding to seek appraisal. But that is not the case here. While the petitioners' Rule 30(b)(6) designees may technically have been lay witnesses, they were hardly unqualified to express views about valuation. If Hudson Bay and Fortress believe otherwise, then perhaps they should begin disclosing to their investors that the financial professionals who manage their funds are not qualified to do their jobs.

Hudson Bay's Rule 30(b)(6) designee was Choi, who is currently a portfolio manager for the fund and has held that position for six years. He received his undergraduate degree from Boston University in 1998, having majored in business with a dual concentration in finance and information systems, and minored in economics. After college, he worked as an investment banker, first spending a year as a securities analyst with a boutique firm called Montgomery Securities, then joining Goldman Sachs. He started at Goldman Sachs as an analyst. Over the course of five years at the firm, he rose to the level of vice president. In 2005, he joined Thales Fund Management, a hedge fund, as a portfolio manager. After spending two years there, he moved to Hudson Bay.

Choi testified that as a portfolio manager, he manages a portfolio of securities and regularly makes decisions about buying and selling stocks. Although sometimes he makes decisions based on market events, on other occasions he makes decisions based on extensive research and analysis. For Dole, he took into account a valuation that used three

20

methodologies: DCF, comparable companies, and sum of the parts. Choi testified in general terms about the methodologies and demonstrated a level of familiarity with the relevant concepts, as one would expect a portfolio manager to have.

Ripe's Rule 30(b)(6) designee was Neumark, a managing director of FIG. He graduated from Vanderbilt University and then obtained a law degree at UCLA. Although he originally joined FIG's legal department, he subsequently became a managing director and no longer practices law. His current job includes sourcing investments for the company, and he reports to the co-heads of the corporate securities group. He frequently prepares valuation analyses using the DCF method, and the petitioners concede that Neumark "has business skills that enable him to conduct a discounted cash flow and other financial analyses." Opp. at 29 n.22.

Neumark was the investment professional with lead responsibility for the Dole investment, including the buying of Dole shares. He prepared the business case for the investment committee which recommended that the fund buy Dole shares, and the investment committee authorized the transaction based on his analysis. As part of his work, he prepared a valuation of Dole that used the DCF methodology. He also considered using other methodologies. Like Choi, Neumark evidenced his familiarity with the components and assumptions that comprise a DCF analysis. Neumark's valuation included different assumptions, including a downside case.

Based on their depositions, training, and experience, both Choi and Neumark seem more than capable of testifying from personal knowledge about Dole and the value of its shares. To the extent their testimony carries overtones of opinion testimony, those

opinions will be helpful to the court. Although not necessary for them to express their opinions, both likely could be qualified as experts by dint of their training and experience. In my view, their status as lay witnesses does not foreclose their ability to testify on the valuation work the performed or their views on valuation.

### c.    Appraisal As A "Battle Of The Experts"

As the keystone for their assertion that valuation should be exclusively a matter for experts such that lay opinion is not admissible, the petitioners point to the Delaware Supreme Court's description of an appraisal proceeding as a "battle of experts." Opp. at 20 (citing *Rapid-Am. Corp. v. Harris*, 603 A.2d 796, 802 (Del. 1992)). The *Rapid-American* decision is only one of many cases to have made this observation.[9] These decisions have not employed this phrase approvingly to suggest limitations on the scope of admissible evidence. Rather, they have used the term as a shorthand reference to what the Delaware Supreme Court identified as "a recurring theme in . . . appraisal cases—the clash of contrary, and often antagonistic, expert opinions on value." *In re Shell Oil Co.*, 607 A.2d 1213, 122 (Del. 1992).

---

[9] *See, e.g.*, *Kahn v. Household Acq. Corp.*, 591 A.2d 166, 175 (Del. 1991); *Cede & Co. v. Technicolor, Inc.*, 2003 WL 23700218, at *2 (Del. Ch. Dec. 31, 2003), *aff'd in part, rev'd in part*, 884 A.2d 26 (Del. 2005); *Hanover Direct, Inc. S'holders Litig.*, 2010 WL 3959399, at *1 (Del. Ch. Sept. 24, 2010); *In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, at *11 (Del. Ch. May 3, 2004); *see also S. Muoio & Co. LLC v. Hallmark Entm't Invs. Co.*, 2011 WL 863007, at *2 (Del. Ch. Mar. 9, 2011) (describing valuation issues in breach of fiduciary duty case as a "battle of the experts"), *aff'd*, 35 A.3d 419 (Del. 2011).

In appraisal proceedings, the battling experts tend to generate widely divergent valuations as they strive to bracket the outer limits of plausibility. Chief Justice Strine, writing as a Vice Chancellor, described the phenomenon as follows:

> Men and women who purport to be applying sound, academically-validated valuation techniques come to this court and, through the neutral application of their expertise to the facts, come to widely disparate results, even when applying the same methodology. These starkly contrasting presentations have, given the duties required of this court, imposed upon trial judges the responsibility to forge a responsible valuation from what is often ridiculously biased "expert" input.

*Finkelstein*, 2005 WL 1074364, at *13 (footnote omitted). Five years later, again writing as a Vice Chancellor, the Chief Justice described another example of this process in operation:

> As is typical, the outcome of this appraisal proceeding largely depends on my acceptance, rejection, or modification of the views of the parties' valuation experts. Both experts were well qualified to testify about the appropriate inputs to use . . . Both these men of valuation science purported to apply the same primary method of valuation—the discounted cash flow ("DCF") method—but the expert for the petitioners came up with a value of $139 per share and the expert for [respondent] came up with a value of only $88 per share—a modest $51 per share valuation gap.

*Global GT*, 993 A.2d at 499-50. Numerous other decisions express similar sentiments about widely divergent, litigation-driven expert valuations.[10]

---

[10] *See, e.g., Emerging Commc'ns*, 2004 WL 1305745, at *11 (comparing petitioner's valuation of $41 per share with respondent's valuation of $10.38 per share and noting that "[t]hese widely differing valuations of the same company result from quite different financial assumptions that each sponsoring side exhorts this Court to accept"); *Del. Open MRI Radiology Assocs., P.A. v. Kessler*, 898 A.2d 290, 310-11 (Del. Ch. 2006) (noting that "competing experts have provided widely divergent estimates of value, while supposedly using the same well-established principles of corporate finance"); *Gray v. Cytokine Pharmasciences, Inc.*, 2002 WL 853549, at *6 (Del. Ch. Apr.

Rather than supporting the petitioners' idealized depiction of valuation as a scientific process that should be reserved exclusively for neutral opiners, the martial metaphor suggests the need to consider other evidence as a check on the warring experts' models. One informative source of probative evidence is the contemporaneous views of financial professionals who make investment decisions with real money:

> [S]elf-interest concentrates the mind, and people who must back their beliefs with their purses are more likely to assess the value of the judgment accurately than are people who simply seek to make an argument. Astute investors survive in competition; those who do not understand the value of assets are pushed aside. There is no similar process of natural selection among expert witnesses and [] judges.

*Matter of Cent. Ice Cream Co.*, 836 F.2d 1068, 1072 n.3 (7th Cir. 1987) (Easterbrook, J.); *see Union Ill. 1995 Inv. Ltd. P'ship v. Union Fin. Grp., Ltd.*, 847 A.2d 340, 359 (Del. Ch. 2004) (Strine, V.C.) ("The benefit of the active market for UFG as an entity that the sales process generated is that several buyers with a profit motive were able to assess these factors for themselves and to use those assessments to make bids with actual money

---

25, 2002) ("As is all too often the case, the parties' experts . . . came up with enormously disparate conclusions as to [the company's value]"); *Kleinwort Benson Ltd. v. Silgan Corp.*, 1995 WL 376911, at *5 (Del. Ch. June 15, 1995) (noting the need to scrutinize analyses "to remove the adversarial hyperbole that inevitably influences an expert's opinion in valuation proceedings"); *Cede & Co. v. Technicolor, Inc.* (*Technicolor I*), 1990 WL 161084, at *32 (Del. Ch. Oct. 19, 1990), *consolidated with Cinerama, Inc. v. Technicolor, Inc.*, 1991 WL 111134 (Del. Ch. June 24, 1991), *and aff'd in part and rev'd in part on other grounds*, 634 A.2d 345 (Del. 1993) (noting competing valuations and observing that "[t]he dynamics of litigation no doubt contribute to this distressingly wide difference"); *Salomon Bros. v. Interstate Bakeries Corp.*, 1992 WL 94367, at *3 (Del. Ch. May 4, 1992) (noting "each expert's apparent bias toward a result that would yield the highest or lowest possible number in accordance with his client's interests.").

behind them. For me (as a law-trained judge) to second-guess the price that resulted from that process involves an exercise in hubris and, at best, reasoned guess-work.")

The petitioners' internal, contemporaneous valuations are real-world assessments by "astute investors" who must "back their beliefs with their purses." Their views may prove to be as or even more credible than the litigation-crafted opinions of valuation experts. Consistent with this approach, Justice Jacobs, then a Vice Chancellor, ruled that an appraisal petitioner who had prepared a valuation of the subject company was not "protected from giving valuation testimony." *Greenlight I*, 2000 WL 33521110, at \*1. He held that "if *in fact* [the petitioner] arrived at a valuation of the Respondent corporation," then the witness can "be questioned about his valuation and the basis therefor." *Id.* (emphasis in original). The scope of permissible inquiry included, among other things, the witness' "'bottom line' valuation range, and any intermediate data and calculations leading thereto." *Greenlight II*, 2001 WL 220861, at \*1. The facts about the petitioners' pre-litigation analyses can be used similarly both as evidence of value and to cross-examine their experts.

The approach that Delaware courts have taken to other types of real-world evidence reinforces the propriety of considering the petitioners' pre-litigation assessments of value. A court may consider contemporaneous evidence of market behavior, such as the fact that "knowledgeable officers and directors all sold their stock" at the transaction price. *Technicolor I*, 1990 WL 161084, at \*32. Sales of this type are not expert opinion; they provide indirect evidence of what knowledgeable lay people believed the value to be. Similarly, a court may consider third party offers to purchase

25

corporate assets "as a 'reality check' [on] any independently determined valuation," such as offers to purchase a wholly owned subsidiary whose operations were not altered by the merger giving rise to appraisal rights. *Ryan v. Tad's Enters., Inc.*, 709 A.2d 682, 702 (Del. Ch. 1996) (considering offers to purchase one of corporation's two remaining businesses four months after the merger, one year after the merger, and two years after the merger). The offers are not expert opinion but rather market evidence of what knowledgeable lay people believed about the value of the asset.

The same logic can be extended to the consideration offered in the merger giving rise to the appraisal proceeding. Technically, the merger price is not an expert opinion. It is a data point evidencing what knowledgeable lay people (the buyers and sellers) believed about the value of the company. Yet the Delaware Supreme Court has held that a trial court can consider the merger price as evidence of fair value.[11] And this court has remarked that "[t]he fact that a transaction price was forged in the crucible of objective market reality (as distinguished from the unavoidably subjective thought process of a valuation expert) is viewed as strong evidence that the price is fair." *Van de Walle v. Unimation, Inc.*, 1991 WL 29303, at *17 (Del. Ch. Mar. 6, 1991); *accord M.P.M. Enters.,*

---

[11] *M.P.M. Enters.*, 731 A.2d at 796; *see also Golden*, 11 A.3d at 217-18 (holding that the trial court, when considering the merger price, shall not presumptively defer to it). This court has done so in various cases. *See, e.g.*, *Huff*, 2013 WL 5878807, at *1 (relying on merger price to determine fair value); *Highfields*, 939 A.2d at 59-61 (Del. Ch. 2007) (finding on facts of case that the transaction price provided a solid indicator of fair value); *ONTI, Inc. v. Integra Bank*, 751 A.2d 904, 907 (Del. Ch. 1999) (basing appraisal valuation in part on merger price).

731 A.2d at 796 ("A merger price resulting from arms-length negotiations where there are no claims of collusion is a very strong indication of fair value.").

Similar reasoning applies to the subject company's market price. The market price is not expert testimony. It represents an aggregation of the views that many lay people hold about the value of a stock. Under Delaware law, "market value cannot be the sole source of relevant information in fixing 'fair value.'"[12] Yet within the statutory command to consider "all relevant factors" when determining fair value, *see* 8 *Del. C.* § 262(h), the "market price is a relevant factor of some weight where the market is active and where no special consideration indicating that it should be given no weight is present."[13] Indeed,

---

[12] *Technicolor I*, 1990 WL 161084, at *18 n.39; *see Rapid Am. Corp.*, 603 A.2d at 806 ("the Court of Chancery long ago rejected exclusive reliance upon market value in an appraisal action"); *Bell v. Kirby Lumber Corp.*, 413 A.2d 137, 141 (Del. 1980) ("market value may not be taken as the sole measure of the value of the stock") (citations omitted)' *In re Del. Racing Ass'n*, 213 A.2d 203, 211 (Del. 1965) ("It is, of course, equally axiomatic that market value, either actual or constructed, is not the sole element to be taken into consideration in the appraisal of stock."); *Jacques Coe & Co. v. Minneapolis-Moline Co.*, 75 A.2d 244, 247 (Del. Ch. 1950) (observing that market price should not be exclusive measure of value); *Chi. Corp. v. Munds*, 172 A. 452, 455 (Del. Ch. 1934) (rejecting market price as sole measure of value in an appraisal because "[t]here are too many accidental circumstances entering into the making of market prices to admit them as sure and exclusive reflectors of fair value").

[13] *Technicolor I*, 1990 WL 161084, at *18 n.39; *see Gonsalves v. Straight Arrow Publ'rs, Inc.*, 793 A.2d 312, 326 (Del. Ch. 1998) (noting that the "market value model[] . . . may be used, in an appropriate situation, to provide a relevant estimate of fair value"); *Cooper v. Pabst Brewing Co.*, 1993 WL 208763, at *8 (Del. Ch. June 8, 1993) (determining value of shares "primarily based upon an estimated actual market value of the stock"); *ONTI*, 751 A.2d at 915 (considering stock price by valuing the shares at a discount to that price to "factor in this limited market for the shares"). In addition, where this court has considered comparable company analyses in valuations, it is relying in part upon the market price of other companies that are found to be similar to the company at issue. *See, e.g.*, *Andaloro v. PFPC Worldwide, Inc.*, 2005 WL 2045640, at *18-20 (Del.

27

"[w]here there is an established market for a corporation's stock, market value must be considered in appraising the value of the corporation's shares."[14] At a minimum, the "[m]arket price of a traded security must always be evaluated to ascertain the degree of weight it deserves in an appraisal." *Technicolor I*, 1990 WL 161084, at *31.

In addition to using non-expert evidence when determining the ultimate question of fair value, Delaware courts have used non-expert evidence to evaluate the credibility of valuation inputs. Experts can act strategically when selecting comparable companies or precedent transactions, when picking multiples, or when choosing inputs for their cost-of-capital calculations. Perhaps more importantly, academic studies have shown that experts unconsciously reach higher or lower results depending on whether they represent the plaintiff or the defendant due to cognitive phenomena like attachment bias.[15] It is helpful

---

Ch. Aug. 19, 2005) (Strine, V.C.); *Doft & Co. v. Travelocity.com Inc.*, 2004 WL 1152338, at *8 (Del. Ch. May 20, 2004); *Taylor v. Am. Specialty Retailing Grp., Inc.*, 2003 WL 21753752, at *9 (Del. Ch. July 25, 2003).

[14] *Cooper*, 1993 WL 208763, at *8; *see In re Del. Racing Ass'n*, 213 A.2d at 211 ("It is, of course, axiomatic that if there is an established market for shares of a corporation the market value of such shares must be taken into consideration in an appraisal of their intrinsic value."); *In re Creole Petroleum Corp.*, 1978 WL 2487, at *2 (Del. Ch. Jan.11, 1978) (noting that market value "is normally worthy of great weight"); *cf. Mills v. Elec. Auto-Lite Co.*, 552 F.2d 1239, 1247 (7th Cir. 1977) ("In a market economy, market value will always be the primary gauge of an enterprise's worth."); *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 855 A.2d 1059, 1080 (Del. Ch. 2003) *aff'd*, 840 A.2d 641 (Del. 2003) ("In the real world, market prices matter and are usually considered the best evidence of value.").

[15] *See* Larelle Chapple, Peter Crofts, Colin Ferguson & Jane Hronsky, *Professional Independence and Attachment Bias: An Exploratory Study* 2 (seminar paper) (August 2011), http://www.businessandeconomics.mq.edu.au/our_departments/ accounting_and_corporate_governance/Accg_docs/pdf/seminar_papers/2011/colin_fergu

to check an expert's litigation-driven work or a party's litigation-inspired arguments against other valuations, particularly pre-litigation analyses.[16] The potential for testing courtroom advocacy with pre-litigation positions helps temper "the adversarial hyperbole that inevitably influences an expert's opinion in valuation proceedings." *Kleinwort Benson*, 1995 WL 376911, at *5.

Discovery into the petitioners' analyses also should help promote settlement.[17] When parties and their experts start from extreme points on a bargaining range,

---

son.pdf (finding statistically significant variation in estimates of contract damages provided by independent accounting experts depending on whether the expert was identified as a plaintiff's expert or a defense expert, with a mean plaintiff estimate of $4.2 million and a mean defense estimate of $2.7 million); L.A. Ponemon, *The Objectivity of Accountants' Litigation Support Judgments*, 70 The Accounting Review 467 (1995) (finding that auditors allocated to either the plaintiff or defendant in a disputed insurance claim scenario estimated higher damages when assigned to the plaintiff role than when assigned to the defendant insurance company).

[16] *See, e.g., Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1186 (Del. Ch. 1999) (rejecting a corporation's challenge to the comparable companies used by plaintiffs expert where the defendant's investment banker "in preparing his fairness opinion . . . included, as comparable companies, essentially the same ones"); *Neal v. Ala. By-Prods. Corp.*, 1990 WL 109243, at *11 n.9 (Del. Ch. Aug. 1, 1999) *aff'd*, 588 A.2d 255 (Del. 1991) (finding "a certain hollowness" in corporation's objection to valuation that used same assumption as company's own internal valuation); *Cavalier Oil Corp. v. Harnett*, 1988 WL 15816, at *12, *16, *18, *31 (Del. Ch. Feb. 22, 1988) (repeatedly noting conflicts between company's positions and internal documents, including earlier internal appraisal).

[17] *See Caskey v. Man Roland, Inc.*, 83 F.3d 418 (5th Cir. 1996) ("[O]ne of the purposes of open discovery is to promote settlement."); *Bond v. Dist. Court, In & For Denver Cnty.*, 682 P.2d 33, 40 (Colo. 1984) ("The purposes of pretrial discovery include: . . . the promotion of expeditious settlement of cases."); *Martin v. Long Island R. Co.*, 63 F.R.D. 53, 54 (E.D.N.Y. 1974) ("Meaningful settlement discussions will be facilitated if the . . . parties can evaluate possible evidence. An overwhelming percentage of civil cases

compromise is more difficult.[18] Access to both sides' pre-litigation valuations should help de-bias the litigation positions, constrain the range, and promote settlement.

### 3. The Objection To Potential Admissibility Is Overruled.

In requesting documents relating to petitioners' valuations, serving interrogatories about them, and identifying the valuations as topics for the Rule 30(b)(6) depositions, Dole sought discovery that fell within the scope of Rule 26(b)(1) under this court's precedents. Having considered the petitioner's arguments at length, this decision concludes that the information is discoverable under Rule 26(b)(1) because it is both relevant and reasonably calculated to lead to the discovery of admissible evidence.

## C. Privilege And Work Product

Ripe has claimed separately that its valuation information is not discoverable because it is privileged or constitutes work product. Ripe focuses in particular on the

---

are settled. It is as important to have fair procedures for this kind of disposition as it is for trials.").

[18] *See* Linda Babcock & George Loewenstein, *Explaining Bargaining Impasse: The Role of Self-Serving Biases*, 11 Journal of Economic Perspectives 109 (1997) (describing a study in which participants assigned to the role of plaintiff generated significantly higher confidential estimates of the amount of damages that a judge would award than defendants, and that the more divergent the amounts, the more likely that a bargaining impasse would be reached); Linda Babcock, *et al.*, *Biased Judgments of Fairness in Bargaining*, 85 Am. Econ. Rev. 1337 (1995) (describing similar experiment generating similar results); George Loewenstein, *et al.*, *Self-Serving Assessments of Fairness and Pre-Trial Bargaining*, 22 J. Legal Studs. 135 (1993) (same); Leigh Thompson & George Loewenstein, *Egocentric Interpretations of Fairness and Interpersonal Conflict*, 51 Organizational Behavior and Human Decision Processes 176 (1992) (same).

Fortress Memorandum, which Neumark prepared after consultation with petitioners' counsel. Ripe should submit the Fortress Memorandum for *in camera* review.

"The burden of proving that the [attorney-client] privilege applies to a particular communication is on the party asserting the privilege." *Moyer v. Moyer*, 602 A.2d 68, 72 (Del. 1992). An attorney performing a business function "cannot avail himself of the protection associated with the attorney-client privilege or the work product doctrine." *Lee v. Engle*, 1995 WL 761222, at *3 (Del. Ch. Dec. 15, 1995) (rejecting privilege assertion where attorney was "not act[ing] in the capacity of . . . in-house counsel") (emphasis removed); *Texaco, Inc. v. Phx. Steel Corp.*, 264 A.2d 523, 526 (Del. Ch. 1970) (rejecting privilege assertion with respect to memorandum prepared by in-house counsel where counsel was "not . . . acting as counsel with regard to the memorandum in question"). When information contains both legal and business aspects, it "will be considered privileged only if the legal aspects predominate." *MPEG LA, L.L.C. v. Dell Global B.V.*, 2013 WL 6628782, at *2 (Del. Ch. Dec. 9, 2013).

The question of whether an attorney was performing a business function or a legal function depends in part on the context. A particular task may be a business function in one context and a legal function in another context without any changes in the task itself. The situation in *AM General Holdings LLC v. Renco Group, Inc.*, 2013 WL 1668627 (Del. Ch. Apr. 18, 2013), while not an appraisal action, is instructive. In *AM General*, attorneys were engaged in valuing an asset according to a method specified by a contract. *Id*. at *2. The court held that during one period of time the attorneys had the primarily business purpose of complying with the contractual requirement to prepare a valuation

31

analysis, so work product protection was not available, while in another period of time the work was "carried out primarily for the purpose of assessing legal options, strategies, and consequences," so work product protection was available. *Id.* Here, it is necessary to make the same distinction between analyses prepared for business purposes, such as analyzing investment opportunities, and analyses primarily focused on assessing legal strategies in anticipation of litigation.

Except for the Fortress Memorandum, Ripe has failed to show that its valuation materials warrant protection. Neumark has a law degree, and he originally joined FIG's legal department, but he no longer serves as an in-house lawyer and does not practice law. He is currently a Managing Director whose job includes sourcing investments for the company. In the case of Dole, he prepared valuation analyses to make investment decisions, including a recommendation to his firm's investment committee. He testified that his aim was to make his firm money, not provide legal advice. Absent a particularized showing about a specific document or communication, Ripe has failed to carry its burden of demonstrating that Neumark was acting as a lawyer.

The Fortress Memorandum potentially stands on a different footing. Neumark testified that it contains an analysis of the appraisal statute and was prepared after consultation with outside counsel. It is possible that it contains legal advice or work product and that the legal material can be redacted or otherwise excised. To enable the court to evaluate these claims, Ripe shall provide the Fortress Memorandum to the court for *in camera* review.

**D.     Fee Shifting**

Rule 37(b)(2) provides that if a defendant has violated a discovery order, the court "shall require the party failing to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure." "An award of expenses and fees is mandatory under Rule 37 where a party is found to have failed to honor a discovery request 'unless the Court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.'" *Beck v. Atl. Coast PLC*, 868 A.2d 840, 851-52 (Del. Ch. 2005) (Strine, V.C.) (citations omitted).

The petitioners' relevance objection was unfounded and does not provide a reason to waive fee shifting. The petitioners' objection to potential admissibility was contrary to prior precedent, and, to the extent the petitioners believed that the court should distinguish those cases or reach a different result, it was incumbent upon the petitioners to seek relief. The need for the petitioners to seek a judicial ruling to maintain their objections crystallized once Dole noticed the Rule 30(b)(6) depositions and identified topics to which the petitioners objected on grounds of relevance. Rule 30(d)(1) permits a lawyer to instruct a deponent not to answer "only when necessary to preserve a privilege, to enforce a limitation on evidence directed by the Court, or to present a motion [for protective order]." Rule 30(c) states that during a deposition, "[e]vidence objected to shall be taken subject to the objections." These rules made clear that the petitioners could not stand on their objections by instructing their witnesses not to answer Dole's questions. Instructions not to answer only would be permissible on grounds of privilege

33

or to "enforce a limitation on evidence directed by the Court." The petitioners were obligated to obtain that limitation if they wanted to enforce it.

Under the circumstances, the petitioners' failure to provide the discovery was not substantially justified. Dole is awarded the reasonable costs, including attorneys' fees, that it incurred in taking the Rule 30(b)(6) depositions of Choi and Neumark and in bringing this motion to compel. The award should not be interpreted as a sanction for bad faith litigation conduct. It is simply the consequence contemplated by Rule 37 as part of an incentive structure intended by the drafters of the amended rule to limit the need for judicial intervention in discovery disputes.

### III. CONCLUSION

Within one week of the date of this decision, petitioners shall (i) produce all documents reflecting or relating to any valuations or similar analyses of Dole that Hudson Bay and Ripe prepared, reviewed, or considered, (ii) serve supplemental responses to interrogatories that answer questions directed to these issues, and (iii) designate Rule 30(b)(6) witnesses to testify about the topics to which Hudson Bay and Ripe previously objected. The materials covered by this decision include:

- All written documents, including Excel files, that set forth, summarize, or otherwise reflect valuation analyses of Dole or Dole stock, including the Hudson Bay valuation analysis Excel file;

- Any internal valuations of Dole or Dole stock;

- Any valuations of Dole or Dole stock reviewed or considered by Petitioners in connection with this action;

- All non-privileged documents and communications in Petitioners' possession, custody, or control that are responsive to Request Nos. 11 and 17; and

- All non-privileged information in Petitioners' possession, custody, or control that is responsive to Interrogatory Nos. 1 and 4-7.

The lone exception is the Fortress Memorandum, which Ripe shall provide to the court for *in camera* review. For the Rule 37 award of fees and costs, Dole's counsel shall submit a Rule 88 affidavit and a proposed form of implementing order. If the petitioners object to the reasonableness of the amounts sought, they may file an opposition within ten days, to which Dole may reply.